IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RACHEL JANE CONTRERAS,                          Case No. 6:14-cv-01167-SB

            Plaintiff,                          **FINDINGS AND**
                                                **RECOMMENDATION**

            v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

            Defendant.

---

**BECKERMAN, Magistrate Judge.**

       Rachel Jane Contreras appeals the Commissioner of Social Security's ("Commissioner") final decision denying her application for Supplemental Security Income Benefits ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons explained below, the Court recommends that the district judge affirm the Commissioner's decision.

Page 1 - FINDINGS AND RECOMMENDATION

## I. BACKGROUND

**A.**   **Procedural History**

On August 25, 2010, Contreras protectively filed an application for SSI, alleging disability beginning May 19, 2009, due to post traumatic stress disorder ("PTSD"), major depressive disorder, personality disorder, and either learning/cognitive disorder or borderline intellectual functioning. After the Commissioner denied her application initially and upon reconsideration, Contreras filed a written request for a hearing before an administrative law judge ("ALJ"). On November 28, 2012, Contreras, represented by counsel, appeared and testified before an ALJ. A vocational expert ("VE") also testified at the hearing.

On February 1, 2013, the ALJ issued a decision finding Contreras not disabled, as defined by the Act. Contreras filed a request for review of the ALJ's decision. On April 9, 2014, the Appeals Council denied Contreras' request for review, making the ALJ's decision the Commissioner's final decision. 20 C.F.R. §§ 404.981, 422.210. Contreras timely filed this appeal.

**B.**   **Factual History**

Contreras was 25 years old on the alleged onset date of her disability. Contreras attended school through the eighth grade, she received ninth grade instruction at home, and she did not obtain a GED. (Tr. 36-37.)[1] Contreras has past relevant work as a jewelry assembler. She stopped working when her employer "closed down." (Tr. 50.)

**C.**   **The ALJ's Decision**

The ALJ applied the five-step disability evaluation process. 20 C.F.R. § 404.1520. *See Lester v. Chater,* 81 F.3d 821, 828 n.5 (9th Cir. 1995) (describing the five-step process). At step one, the

---

[1]   "Tr." refers to the official transcript of the administrative record. (ECF No. 7.)

ALJ found Contreras had not engaged in substantial gainful activity since August 25, 2010, the

application date. (Tr. 14.) At step two, the ALJ determined Contreras suffered from a number of

severe impairments, including PTSD, major depressive disorder, personality disorder, and either

learning/cognitive disorder or borderline intellectual functioning. (Tr. 14.) The ALJ concluded

Contreras was not presumed disabled at step three, because her condition did not meet or equal any

of the listed impairments. 20 C.F.R., Pt. 4, Subpt. P, App. 1. (Tr. 15-17.) The ALJ then assessed

Contreras' residual functional capacity ("RFC"), and applied this RFC assessment at steps four and

five. *See* 20 C.F.R. § 404.1520(4) ("Before we go from step three to step four, we assess your residual

functional capacity. . . . We use this residual functional capacity assessment at both step four and step

five when we evaluate your claim at these steps.").

The ALJ found that Contreras had the following RFC:

[T]o perform a full range of work at all exertional levels but with the following
nonexertional limitations: She can perform simple routine work tasks/instructions.
She can perform work tasks that can be performed with little need for redirection by
supervisors and requires only structured superficial interaction with co-workers. She
can have little or no contact with the public. Due to low stress tolerance, she cannot
work at a production pace type job. She must have a job with few changes or
transitions in the work setting. She should not work in an environment with more
than two to three people in a small room, but can work in a setting with more people
in a large room but only two to three people in close proximity, but without several
feet distance between workers in excess of two or three.

(Tr. 17.) Although the ALJ recognized that Contreras' testimony regarding additional limitations

would establish a lower RFC, he rejected her subjective testimony as "not fully credible . . .

[because] some of her allegations are not supported by the evidence or her activity level." (Tr. 20.)

On the basis of this RFC assessment and the VE testimony at step four, the ALJ found

Contreras was unable to perform her past relevant work. The ALJ also determined that Contreras'

transferability of job skills was not material to the disability determination. Under the Medical-Vocational Rules, Contreras was not disabled whether or not she had transferable job skills. (Tr. 23.) At step five, the ALJ determined Contreras was not disabled because she retained the capacity to perform other work that existed in sufficient numbers in the national economy. In making this determination, the ALJ posed a hypothetical question to the VE based upon Contreras' RFC. In response, the VE testified that a person with the specified RFC could perform occupations such as a "Cleaner, Lab Equipment" or a "Polisher of Optical Goods." (Tr. 23-24.)

## II. STANDARD OF REVIEW

A district court reviews the Commissioner's decision to ensure that the Commissioner applied proper legal standards and that the ALJ's findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1222 (9th Cir. 2009). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen,* 881 F.2d 747, 750 (9th Cir. 1989). The reviewing court may not substitute its judgment for that of the Commissioner, *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006), or "give vent to feelings of compassion." *Winans v. Bowen,* 853 F.2d 643, 655 (9th Cir. 1987).

## III. DISCUSSION

Contreras argues that this case should be remanded for an award of benefits because the ALJ: (1) failed to credit the opinion of Dr. David Truhn, an examining psychologist, (2) failed to give

clear and convincing reasons for rejecting Contreras' testimony, (3) erred in his consideration of the lay evidence, and (4) failed to meet his burden to show Contreras retained the ability to perform other work in the national economy. (Pl.'s Brief 11-12.)

## A.    ALJ's Evaluation of the Medical Source Evidence

Contreras argues on appeal that the ALJ failed to provide legally sufficient reasons for his decision not to credit the opinion of David Truhn Psy.D., an examining psychologist, who concluded that Contreras lacks the intellectual and cognitive resources to seek and maintain competitive work. (Pl.'s Brief 12; Pl.'s Reply Brief 1.) The Court finds that the reasons the ALJ provided were specific and legitimate, and supported by substantial evidence in the record.

### 1.    Legal Standard

To establish a physical or mental impairment, a claimant must provide evidence from medical sources. Acceptable medical sources include licensed psychologists. 20 C.F.R. § 404.1513(a). Further, there are three types of physician opinions: (1) those who treat the claimant ("treating physician"), (2) those who examine but do not treat the claimant ("examining physician"), and (3) those who neither examine nor treat the claimant, but review the claimant's medical records ("nonexamining physician"). 20 C.F.R. § 404.1527(d); *Holohan v. Massanari,* 246 F.3d 1195, 1201-02 (9th Cir. 2001). Regardless of the type of physician opinion proffered, the ALJ is never relieved of his obligation to consider evidence submitted by each source, and to provide a reason for rejecting evidence. *See* 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.").

Generally, more weight is ascribed to a treating physician's opinion than to the opinions of non-treating physicians. *Holohan,* 246 F.3d at 1201-02; *Lester,* 81 F.3d at 830. The ALJ may not

reject the uncontroverted opinion or ultimate conclusions of a treating physician (or examining physician) without providing "clear and convincing" reasons supported by substantial evidence in the record. *Lester,* 81 F.3d at 830-31. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes,* 881 F.2d at 750 (quotations and citation omitted). The ALJ may, however, reject contradicted medical opinions by providing "specific and legitimate reasons," supported by substantial evidence. *Bayliss v. Barnhardt*, 427 F.3d 1211, 1216 (9th Cir. 2003).

2.    **Medical Source Evidence**

(a)    **Drs. Megan Nicoloff and Joshua Boyd (Nonexamining Psychologists)**

Megan Nicoloff, Psy.D., and Joshua Boyd, Psy.D., state agency psychologists, reviewed Contreras' records for a disability determination. (Tr. 79-86, 94-98.) In 2010, Dr. Nicoloff reviewed records from Options Counseling Services and Dr. Beckwith. (Tr. 81.) In addition, Dr. Nicoloff considered evidence of Contreras' work history, her activities of daily living, and a third-party function report submitted by Contreras' mother, Melinda R. Smith. (Tr. 80, 180-189.) Dr. Nicoloff completed a Mental Residual Functional Capacity assessment ("MRFC"). While Dr. Nicoloff opined that Contreras had "understanding and memory limitations" and "sustained concentration and persistence limitations," she concluded Contreras was "[n]ot significantly limited" in her "ability to complete a normal workday and workweek . . . ." (Tr. 85.)

In 2011, Dr. Boyd reviewed the same evidence sources as Dr. Nicoloff, and the report submitted by Dr. Roman, which was subsequent to Dr. Nicoloff's review. (Tr. 90-98.) Dr. Boyd completed an MRFC assessment, and concluded Contreras was able to complete a normal workday and workweek. Specifically, Dr. Boyd concluded:

Page 6 - FINDINGS AND RECOMMENDATION

> The [claimant] can complete a normal workday/workweek at a consistent pace. The [claimant] can make work-related decisions. The [claimant] can sustain a routine and maintain a schedule. She can carry out simple instructions. She is occasionally limited in her ability to carry out detailed instructions, and to maintain concentration for extended periods.

(Tr. 98.)

### (b)    Dr. Jeffery Beckwith (Treating Physician)

Dr. Jeffery Beckwith was Contreras' treating physician from January 2008 until October 2010. During that time, Contreras sought treatment from Dr. Beckwith for mental health concerns on four occasions.[2] (Tr. 217-218.) The first occasion was on May 14, 2009, when Dr. Beckwith saw Contreras for a depression check and headaches. Approximately ten days earlier, Contreras attempted suicide by ingesting "a handful of Zantrex-3 diet pills." (Tr. 250.) The Poison Control Center determined that "the pills contained ginseng and caffeine and had an extremely low risk for severe toxicity." (Tr. 250.) Dr. Beckwith assessed Contreras with "[d]epression with anxiety" and prescribed daily citalopram (Celexa). (Tr. 248-249.) Dr. Beckwith also discussed cognitive behavior therapy with Contreras. (Tr. 249.) Dr. Beckwith recommended a follow-up visit in four weeks. (Tr. 249.)

On July 14, 2009, Dr. Beckwith tested Contreras for bipolar disorder. (Tr. 246.) Dr. Beckwith assessed Contreras with bipolar disorder, not otherwise specified ("NOS"). Following a lengthy discussion with Contreras about her bipolar diagnosis, Dr. Beckwith prescribed daily Lamotrigine. Dr. Beckwith requested that Contreras return within four to six weeks. (Tr. 246.)

---

[2] While Contreras visited Dr. Beckwith on numerous other occasions, the chief complaint(s) at those visits were physical (headaches, asthma, or iron deficiency). (Tr. 217-218.) There are no physical impairments at issue in this case and, as such, the Court will not recount the details or findings from those examinations.

Page 7 - FINDINGS AND RECOMMENDATION

Over one year later, on August 26, 2010, Contreras returned to Dr. Beckwith with a chief complaint of "Mental Health Issues." (Tr. 227.) Dr. Beckwith recorded her interim history:

> Follow up, pt is seeing Suzanne MacDonald for counseling @ Option. She has been diagnosed as having depression and bipolar illness. Her prescribing doctor is Richard Browning. She has been on citalopram for a year, lamotrigine since July. Sleep is better and mood is somewhat better. She is applying for Social Security disability . . . . I don't believe she's ever been able to hold a job [due] to mental health issues.

(Tr. 227.) Although Dr. Beckwith assessed Contreras with depressive disorder NOS, and bipolar disorder NOS, he specifically noted Contreras was "a bit better" and "[s]he does look calmer and happier than on prior visits here." (Tr. 227-228.) Dr. Beckwith "[s]trongly encouraged continuation of current [medications] and treatments and counseling" and recommended Contreras follow up as needed. (Tr. 228.)

On October 11, 2010, Contreras sought treatment from Dr. Beckwith for headaches and a JOBS program work up. (Tr. 223.) Dr. Beckwith again assessed Contreras with depressive disorder NOS, but opined that Contreras was "okay for full participation with the jobs program." (Tr. 224.)

### (c)    Dr. Pamela Roman (Consultative Examiner)

A state agency examiner referred Contreras to Pamela Roman, Ph.D., a consultative examiner, for a pyschodiagnostic assessment. On May 12, 2011, Dr. Roman evaluated Contreras. Dr. Roman's assessment procedures included a review of records, a clinical interview, and psychometric testing. (Tr. 300 (specific records noted).) Dr. Roman administered Information, Orientation, and Mental Control subtests from the Wechsler Memory Scale, Revised, the Digit Span subtest from the Wechsler Adult Intelligence Scale - Fourth Edition ("WAIS-IV"), the Calculation subtest from Woodcock-Johnson III, Tests of Achievement, the Beck Anxiety Inventory ("BAI"), and the Beck Depression Inventory, Second Edition ("BDI-II"). (Tr. 300.) On the WAIS-IV,

Page 8 - FINDINGS AND RECOMMENDATION

Contreras received a scaled score of seven, placing her in the sixteenth percentile. (Tr. 303.) Results of the BAI indicated Contreras experienced moderate anxiety (Tr. 303), and Contreras scored in the severe range for depression on the BDI-II. (Tr. 304).

Dr. Roman diagnosed Contreras with major depressive disorder, a prior diagnosis of bipolar disorder, sexual abuse as a child, physical abuse as an adult, and borderline intellectual functioning. (Tr. 304.) Dr. Roman determined there was "not sufficient symptomatology currently for a diagnosis of PTSD or bipolar disorder." (Tr. 304.) Dr. Roman concluded that if Contreras "were given tasks that were simple and repetitive in nature she should be able to maintain attention and concentration throughout a normal workweek and workday." (Tr. 304.) In fact, Dr. Roman noted in her report that Contreras was "looking for work." (Tr. 301.)

### (d)    Joseph Reilly (Examining Psychotherapist)

In May 2012, Contreras sought an evaluation for her disability claim. Contreras' attorney referred her to Linn County Mental Health where she was seen by Joseph Reilly, LMFT. (Tr. 312.) Reilly performed an initial assessment. Contreras reported bipolar and depression as her chief complaints. (Tr. 312.) Reilly assigned Contreras DSM-IV diagnoses of PTSD and major depression, recurrent, moderate. (Tr. 314.) Contreras reported to Reilly that "she has applied and been denied three times for SSI – the first time was about 5 years ago. She said that she is applying for SSI because she was told that Bipolar Disorder 'is a disability that does not go away.'" (Tr. 312.) Reilly noted that "one of [Contreras'] current stresses is trying to find work." (Tr. 312.) Reilly did not offer an opinion on whether Contreras' impairments prevented her from engaging in a normal workday and workweek.

Page 9 - FINDINGS AND RECOMMENDATION

### (e)    Stacey Bartholomew (Treating Psychotherapist)

In May 2012, Contreras began counseling with Stacey Bartholomew, MS. (Tr. 358.) Between May 2012 and October 2012, Contreras participated in ten counseling sessions with Bartholomew. (Tr. 348-358.) At the initial visit, Bartholomew covered "counseling methods, trauma education, orientation to [Contreras'] history and experiences with counseling and relationships." (Tr. 358.) Bartholomew also "introduced meditation and neurophysiology" and "discussed [a] treatment plan" with Contreras. (Tr. 358.) At subsequent counseling sessions, Bartholomew and Contreras focused mostly on Contreras' relationship with her children and parenting techniques. The balance of the time was spent on past trauma experienced by Contreras. (Tr. 349-358.)

On November 8, 2012, Bartholomew responded to questions propounded by Contreras' attorney. Bartholomew listed "Post Traumatic Stress Disorder and Major Depression Recurrent, Moderate" as Contreras' diagnoses. (Tr. 328.) In response to the attorney's question regarding whether Contreras "could sustain a simple routine, low stress job, that does not require her to work in close coordination with supervisors or co-workers," Bartholomew opined:

> Rachel has some cognitive limitations so that she does not transition easily and if she is able to maintain her current level of activity, she would have the ability to stay focused for more likely part time at this time as she requires at least an hour of exercise daily to reduce mood fluctuations. Home life stress seems to be as much as she can handle at this time.

(Tr. 329.)

### (f)    Dr. David Truhn (Examining Psychologist)

The State Family Pre-SSI Program and Contreras' attorney referred Contreras to Dr. David Truhn, for an opinion whether there were "any psychological, intellectual or personality issues that would impair [Contreras'] ability to seek and maintain competitive employment." (Tr. 332.) On

Page 10 - FINDINGS AND RECOMMENDATION

November 7, 2012, Dr. Truhn met with Contreras for a mental status examination and clinical interviews. Dr. Truhn also conducted a records review. (Tr. 341.) Under Dr. Truhn's supervision, a psychometrist administered the Wide Range Achievement Test-4, the Comprehensive Trail Making Test, the WAIS-IV, the Minnesota Multiphasic Personality Inventory-2RF, and the Millon Clinical Multiaxial Inventory-III. (Tr. 332). Psychometric testing conducted under Dr. Truhn's supervision showed that Contreras has a "Full Scale IQ of 75" that falls at the fifth percentile as compared to others her own age. (Tr. 338.)

Dr. Truhn completed a lengthy "Comprehensive Psychological Evaluation" of Contreras. (Tr. 332-346.) Based on his examination, the psychometric test results, and his records review, Dr. Truhn diagnosed Contreras with PTSD, major depressive disorder, dysthymic disorder, somatoform disorder, pain disorder, R/O Cognitive Disorder, alcohol abuse, borderline intellectual functioning, and personality disorder. (Tr. 342.)

Dr. Truhn also completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)," Form HA-1152-US. In response to the question whether Contreras' impairment affected her ability to "understand, remember, and carry out instructions," Dr. Truhn indicated Contreras has "moderate" restrictions in understanding and remembering simple instructions, "marked" restrictions in carrying out simple instructions and for the "ability to make judgments on simple work-related decisions," and extreme restrictions in understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions. (Tr. 345.) In response to the question whether Contreras' impairment affected her ability to "interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in a routine work setting," Dr. Truhn indicated Contreras has "marked" restrictions for interacting

appropriately with the public, her supervisor(s), and her co-workers. (Tr. 346.) Dr. Truhn did not provide an assessment of whether Contreras' impairment affected her ability to respond to changes in a routine work setting. (Tr. 346.) Dr. Truhn identified "panic, anxiety, depression, PTSD" as the factors that supported his work-related assessment. (Tr. 346.) Dr. Truhn concluded "Contreras is unable to seek and maintain competitive employment." (Tr. 342.)

### 3.    Weight Given to Dr. Truhn's Opinion

 Contreras argues that the ALJ erred when he failed to credit Dr. Truhn's opinion that she was "unable to seek and maintain competitive employment because of her numerous mental health issues." (Pl.'s Brief 12.) The Court disagrees.

The ALJ credited many of Dr. Truhn's diagnoses and found that Contreras suffered from several severe mental impairments (including PTSD, major depressive disorder, personality disorder, learning/cognitive disorder versus borderline intellectual functioning), but the ALJ otherwise gave "little weight" to Dr. Truhn's opinion. (Tr. 14-15.) The ALJ rejected Dr. Truhn's "multiplicity of diagnoses and extreme functional limitations," in part, because they were "based largely on the history provided to him by [Contreras] and testing that is subject to multiple interpretations." (Tr. 15.) The ALJ also discounted Dr. Truhn's findings because the "diagnoses and reported limits are far in excess of prior psychological consultative examinations, psychological treatment reports, or claimant's own allegations." (Tr. 15.) Specifically, the ALJ expressly found "more validity in the report of another psychological examiner, Pamela Roman, Ph.D."[3] (Tr. 15.)

---

[3] Dr. Roman conducted similar, but less extensive, testing than Dr. Truhn. Unlike Dr. Truhn, Dr. Roman did not complete an MRFC assessment for Contreras.

The Court finds that the ALJ provided appropriately specific and legitimate reasons for giving little weight to the extreme limitations included in Dr. Truhn's opinion, and that the ALJ's reasons are supported by substantial evidence.

First, the ALJ's reliance on Dr. Roman's opinion, over that of Dr. Truhn's conflicting opinion, turned on their respective conclusions about whether Contreras could sustain a normal workday and workweek. In support of his decision to accept Dr. Roman's conclusion over Dr. Truhn's, the ALJ relied on other medical evidence in the record, as well as Contreras' activities of daily living. Both of these grounds are permissible reasons to credit one physician's opinion over another. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-03 (9th Cir. 1999) (holding that ALJ may reject a medical opinion that is internally inconsistent, inconsistent with claimant's activities, or inconsistent with other medical findings); *see also* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Specifically, Dr. Roman found that Contreras was "able to understand and remember instructions" during the evaluation, and opined she could do tasks that were "simple and repetitive in nature." (Tr. 304). Dr. Boyd largely agreed with Dr. Roman, concluding that Contreras could perform simple, routine instructions. (Tr. 98). Dr. Beckwith opined that Contreras was "okay for full participation with the jobs program." (Tr. 224.) In contrast, Dr. Truhn found that in light of her marginal intellectual and cognitive resources, Contreras would be markedly limited in making even simple work-related decisions, and markedly limited in interacting with others. (Tr. 342, 345-46). Drs. Roman, Boyd, and Beckwith agreed that Contreras could perform simple, repetitive work, and Dr. Truhn was an outlier in concluding she could not. The ALJ's decision to afford greater weight

to the consensus opinions of these other doctors was a specific and legitimate reason to give Dr. Truhn's opinion less weight, and was supported by substantial evidence. *See Bayliss*, 427 F.3d at 1216 (holding that ALJ's evaluation of the medical evidence is entitled to greater deference when there are conflicting opinions).

Second, the ALJ found that Dr. Truhn's opinion about Contreras' ability to work was "at odds with [Contreras'] current (household management and child rearing duties) and past activities, including successful work experience in 2005 (while experiencing essentially the same longstanding mental impairments)." (Tr. 15.) The record demonstrates that Contreras performs many activities of daily living, and there is no evidence that she requires direct supervision in their performance or that she cannot perform them on a routine basis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) ("We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction."). Among other things, Contreras cleans her house, prepares meals, does laundry, reads, watches television, uses the telephone, does the grocery shopping, cares for her three children (including attending school meetings), and takes walks. (Tr. 51-55, 165-169, 302, 334-336.) Contreras' robust daily living activities contradict Dr. Truhn's opinion that she cannot work.

Furthermore, the ALJ appropriately pointed out that Dr. Truhn's opinion that Contreras is unable to work is not accurate given her work history. (Tr. 21.) Contreras had a successful prior work experience, and her employment ended because the company went out of business, not because she was terminated or resigned. (Tr. 50, 336.) The regulations provide that when a claimant alleges disability on the basis of a mental health condition, "the circumstances surrounding termination of [the claimant's] work effort are particularly useful in determining [the claimant's] ability to function

in a work setting." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(D)(3). Here, there is substantial evidence demonstrating that, at the time of her previous employment, Contreras experienced "essentially the same longstanding mental impairments." (Tr. 15.) As such, Contreras' actual work experience occurred during a time relevant to the disability determination, and must be considered by the ALJ. Contreras' testimony and her earnings records evidence her ability to maintain employment for a sustained period of time. Contreras' prior successful work experience as a jewelry assembler contradicts Dr. Truhn's opinion that she does not have the intellectual or cognitive capacity to work.[4] *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692-93 (9th Cir. 2009) (holding that the ALJ properly rejected medical source evidence when claimant was able to sustain full-time work).

The ALJ provided specific and legitimate reasons to reject Dr. Truhn's assessment that Contreras was unable to work, and those reasons are supported by substantial evidence in the record.

## B.   Claimant's Credibility

Contreras argues that the ALJ failed to provide clear and convincing reasons for rejecting her testimony. The Court finds that the reasons the ALJ provided were specific, clear, and convincing, and supported by substantial evidence in the record.

---

[4]  Dr. Truhn's other diagnoses are not material to this appeal. Dr. Truhn's diagnosis of early onset dysthymic disorder is defined as "a chronically depressed mood that occurs for most of the day more days than not for at least 2 years." *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition Text Revision (2000) ("DSM–IV"). The ALJ found that Contreras suffered from major depressive order, and dysthymic disorder is distinguished from major depressive disorder by the chronic and less severe symptoms. (*Id.*) Dr. Truhn also diagnosed a somatoform disorder and pain disorder. Contreras does not contend that her inability to work is caused by pain, and there is no substantial evidence to demonstrate otherwise. Finally, Dr. Truhn diagnosed Contreras with alcohol abuse, but noted it was in full remission. (Tr. 342.)

### 1.     Legal Standard

The ALJ is required to engage in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Lingenfelter*, 504 F.3d at 1035-36. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan,* 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted). The claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." *Id.* (emphasis in original); *see also Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998) ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

If a claimant meets the first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony only by offering specific, clear and convincing reasons for doing so." *Smolen,* 80 F.3d at 1281; *see also Carmickle v. Comm'r of the Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008) ("The only time this standard does not apply is when there is affirmative evidence the claimant is malingering.").

### 2.     Contreras' Hearing Testimony

At the hearing, Contreras testified she stopped attending school after eighth grade, and her formal education ended after she was home schooled in ninth grade. (Tr. 36.) Contreras "just felt

[school] was too hard." (Tr. 36.) Contreras tried to obtain her GED, but she was unsuccessful. (Tr. 37.)

In 2005, Contreras worked for a jewelry company, Jody Coyote, assembling earrings. (Tr. 38.) Contreras worked at that job for approximately two years, alternating part and full time. (Tr. 38-39.) Contreras testified that it is difficult for her to work because she has "trouble getting along with others. I don't like being told what to do." (Tr. 41.) Contreras explained that she likes to accomplish a task her way, the best way she can, rather than doing it exactly as instructed. (Tr. 41-42, 48.) She does not believe it matters, as long as the job is getting done. (Tr. 42.) Contreras testified there were some difficulties with coworkers and her supervisor, but she was relocated within the company. (Tr. 49-50.) She found her new supervisor much more helpful and likeable. (Tr. 50.) Contreras stopped working for the jewelry company when it "closed down." (Tr. 50.)

Contreras testified that she lives with her three daughters and her boyfriend of two years. (Tr. 56.) She cleans her house "four or five times during the day." (Tr. 51.) She enjoys reading, especially books by Stephen King, and she watches television "almost every day." (Tr. 51.) Contreras attends parent-teacher conferences at her children's school. (Tr. 62.)

Contreras testified she has struggled with anxiety or depression her whole life. (Tr. 43.) She stated she is depressed and gets angry and cries for no reason. (Tr. 64.) Contreras has days where she closes herself in and will not talk to anyone, even her children. (Tr. 66.) At the time of the hearing, Contreras was attending therapy sessions, sporadically, and had stopped all medications because she "didn't feel like it did anything for me." (Tr. 43-44, *see also* Tr. 45-47 (Contreras missed recent therapy appointments, but believes therapy "somewhat helps.").)

Page 17 - FINDINGS AND RECOMMENDATION

Contreras testified that, at times, she has difficulty maintaining her concentration. (Tr. 53.) For example, she will "be doing something and then I'll go to do something else and then I'll go back to doing what I was doing and I'll forget what it was I was doing." (Tr. 53.) Often, her children must remind her about the family's schedule of activities. (Tr. 62.)

Contreras testified she has nightmares and flashbacks from past traumas she experienced. (Tr. 54, 63.) She has nightmares about two times a week and flashbacks about once a month. (Tr. 63.) During the time she is awake, particularly when she is out walking, Contreras is fearful that someone is following her. (Tr. 55.) In addition, she jumps if someone (even her children) comes up from behind and touches her. (Tr. 55.) Contreras is most comfortable in her own home. (Tr. 55.) Contreras testified that she is comfortable in a work setting provided she is not around "too many people." (Tr. 56.) For example, two or three people next to her is fine, but she is troubled by big crowds. (Tr. 56.)

Contreras testified she was arrested and placed into alcohol treatment at the age of 13. (Tr. 57.) She graduated from the treatment program. (Tr. 58.) While Contreras has consumed alcohol since that time, she has not experienced any further alcohol-related problems. (Tr. 58.) However, Contreras also stated she has "drank heavily," and that her children told her it was a problem. (Tr. 59.) That was motivating for Contreras and, at the time of the hearing, she was "sober for two months." (Tr. 59.)

### 3.    The ALJ's Credibility Assessment

At the first step of the credibility analysis, the ALJ determined that Contreras' underlying medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 18.) There was no evidence of malingering, and therefore the ALJ was required at the second

step of the credibility analysis to provide clear and convincing reasons for rejecting Contreras' testimony. *See Lingenfelter*, 504 F.3d at 1036.

In assessing Contreras' credibility, the ALJ concluded that "[t]he claimant's allegations are found to be not fully credible and cannot be relied upon to determine the extent of her limitations." (Tr. 18, *see also* Tr. 20 ("the claimant is found to be not fully credible . . . some of her allegations are simply not supported by the evidence of her activity level.").) The ALJ cited several clear and convincing reasons for this adverse credibility finding, all of which are supported by substantial evidence in the record.

First, the ALJ determined Contreras was not fully credible because her "activity level casts great doubt on her allegations and is not consistent with a finding of disability." (Tr. 20.) The ALJ properly considered Contreras' activities of daily living in assessing her credibility. *See Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014) ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility finding."); *see also Morgan*, 169 F.3d at 600 ("If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations.").

Specifically, the ALJ noted that Contreras takes care of three young children, including taking them to the park and swimming. (Tr. 20, 223, 290.) She attends movies with her boyfriend and children. (Tr. 20, 290, 336.) In addition, Contreras exercises, including yoga, walking, and running. (Tr. 20, 223, 290.) Contreras assists her paraplegic boyfriend with lifts and transfers (Tr. 223), and cares for a friend's son. (Tr. 20.) Contreras reports that she is able to do all household chores, including vacuuming, sweeping, mopping, dusting, and cleaning the kitchen and bathroom.

Page 19 - FINDINGS AND RECOMMENDATION

(Tr. 20, 302.) She rides the bus, uses the computer, reads, watches television, and does laundry. (Tr. 20.) Contreras attends parent-teacher conferences, and meets all of her personal care needs (Tr. 20, 302.) The ALJ appropriately concluded that these activities are inconsistent with someone who claims an inability to work. *See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224-25 (9th Cir. 2010) (holding that the ALJ "provided several cogent reasons for rejecting [claimant's] claim that he could not 'put up' with 'most people,'" including evidence of prior work experiences and evidence of significant personal relationships).

The ALJ also discredited Contreras because she made inconsistent statements on the record. (Tr. 19-20.) In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." *Smolen*, 80 F.3d at 1284. Specifically, the ALJ found that Contreras made inconsistent statements about the efficacy of medication, the frequency of her nightmares, and in reporting her trauma history. (Tr.19-20.)

The ALJ's findings regarding Contreras' inconsistent statements are supported by the record. For example, at the hearing, Contreras stated that medication did not help her (Tr. 44), but in August 2010, Contreras reported that her sleep and mood were "somewhat better" with medication. (Tr. 227.) In addition, in her report to Dr. Roman, Contreras stated that after falling asleep, she sleeps for ten hours, and she denied having nightmares (Tr. 302-303), but at the hearing, Contreras testified that she had nightmares twice a week and that her nightmares interfered with her sleep. (Tr. 63.) The ALJ noted that while Contreras testified that she sometimes locked herself in the house all day, she never reported that to any provider or examining doctor. (Tr. 20). The ALJ also cited Contreras' inconsistent statements regarding her reports of past traumas, including conflicting accounts of an

incident involving a sexual assault, and discrepancies in the events surrounding her ingestion of diet pills. (Tr. 19, 262-263, 290, 301, 303, 313, 335.) All of these inconsistencies are supported by substantial evidence in the record.

This Court finds that the specific reasons the ALJ cited to question Contreras' credibility–the lack of objective medical findings to support the degree of alleged mental impairments, evidence of her activities of daily living and recent successful work history, and inconsistent statements about medication, nightmares, and past traumas–are clear and convincing reasons for an adverse credibility finding, and that all of those reasons are supported by substantial evidence in the record.

## C.      Consideration of Lay Testimony

Contreras also challenges the ALJ's evaluation of the third-party statement submitted by her mother, Melinda R. Smith. (Tr. 180.) The ALJ gave "some weight" to Smith's report, but found that the report "does not establish that [Contreras] is disabled." (Tr. 20.) The ALJ explained that while Smith "was generally credible as to her observations, her statements are inconsistent with the medical evidence [in] the record." (Tr. 20.)

In determining whether a claimant is disabled, an ALJ is required to consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). Such testimony is competent evidence that cannot be disregarded without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss*, 427 F.3d at 1218. Inconsistencies between the lay witness's testimony and the claimant's presentation to her treating physicians or activities of daily living is another reason. *Barber v. Astrue*, No. 1:10-cv-01432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012).

The ALJ noted that Smith reported, among other things, that Contreras is unable to pay attention for long periods, and has difficulty completing tasks and getting along with others. (Tr. 20, 183-185.) The ALJ found that family members are not trained to make exacting clinical observations, and that Contreras' mother's lay opinion was inconsistent with the medical evidence of record. (Tr. 20.) The ALJ was correct. *See* 20 C.F.R. § 416.929(c)(3) (lay evidence must be "consistent with the objective medical evidence and other evidence"). For example, contrary to Smith's report, several medical professionals concluded that Contreras could perform simple, routine tasks. In addition, while Smith reported that Contreras cannot go out alone, Dr. Roman noted that Contreras "uses the bus all the time," and "[s]hops on her own." (Tr. 302.)

Contreras contends that the ALJ failed to credit Ms. Smith's statements regarding Contreras' inability to get along with others. The Court finds that on the contrary, the ALJ's RFC reflects Contreras' social limitations, by imposing significant restrictions in interacting with others, by limiting Contreras to low-stress work, and by restricting Contreras to simple, routine tasks.

In any event, Smith's testimony did not describe limitations beyond those also identified by Contreras, and the ALJ's reasons for rejecting Contreras' testimony "apply with equal force to the lay testimony." *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012).

For all of these reasons, the Court finds that the ALJ provided sufficiently specific and germane reasons for discounting the report of Contreras' mother.

## D.    Commissioner's Burden at Step Five

Contreras asserts that the hypothetical posed to the VE did not include all of her limitations supported by the record. (Pl.'s Brief 19.) The Court disagrees.

At step five, the burden of production shifts to the Commissioner to identify jobs existing in significant numbers in the national economy that the claimant can perform given her RFC, age, education, and work experience. 20 C.F.R. § 404.1560(c)(2); *see also* 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003) (clarifying allocation of burdens in the sequential evaluation process). The Commissioner meets her burden at step five when she relies on the testimony of a VE showing that representative occupations exist in "significant numbers" for an individual with the claimant's RFC, age, education, and work experience. *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). "The hypothetical an ALJ poses to a vocational expert, which derives from the RFC, 'must set out all the limitations and restrictions of the particular claimant.'" *Valentine*, 574 F.3d at 690 (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)). Therefore, "an RFC that fails to take into account a claimant's limitations is defective." *Id*.

Contreras alleges that the hypothetical the ALJ presented to the VE did not take into account all of her limitations. First, Contreras argues the hypothetical did not include Dr. Truhn's finding that she has a "marked" impairment in her ability to carry out simple instructions, make judgments on simple work-related decisions, and interact appropriately with the public, supervisors, and coworkers.[5] Contreras contends the limitations set forth by Dr. Truhn would preclude even simple work on a sustained basis. (Pl.'s Brief 19 (*citing* Tr. 345-346).) Contreras' argument is a restatement of her previous challenge to the ALJ's weighing of the evidence, including the ALJ's decision not to credit certain findings by Dr. Truhn. For the reasons set forth in **Section III.A.(3)**, above, the ALJ was not required to incorporate these limitations into the RFC, or his subsequent hypothetical to the

---

[5] In this context, "marked" is defined as "a serious limitation" with "a substantial loss in the ability to effectively function." (Tr. 345.)

VE. *See Batson v. Comm'r, SSA*, 359 F.3d 1190, 1197 (9th Cir. 2004) ("The ALJ was not required to incorporate evidence from the opinions of [claimant's] treating physicians, which were permissibly discounted.")

Second, Contreras argues that her verbal comprehension score was at the fourth percentile, but the "other jobs" identified by the VE require a worker to be above the bottom ten percent of "verbal aptitude." (Pl.'s Brief 19); *see* Dictionary of Occupational Titles ("DOT") 381.687-022 (Cleaner, Laboratory Equipment), 1991 WL 673259 (Rev. 1991) ("Verbal Aptitude: Level 4 - Lowest 1/3 Excluding Bottom 10%"); DOT 713-687-010 (Repair of Ophthalmic Goods), 1991 WL 679269 (Rev. 1991) (same). With regard to Contreras' ability to follow directions, the ALJ found that Contreras was capable of performing simple, routine work tasks/instructions. (Tr. 17.) As discussed above, that finding is supported by substantial evidence. In any event, there does not appear to be any support for Contreras' assertion that her "verbal comprehension" score correlates with the "verbal aptitude" requirements set forth in the DOT. *Cf. Vasquez v. Astrue*, No. CV 08–5305–OP, 2009 WL 3672519, at *3 (C.D. Cal. Oct. 30, 2009) ("the Court is unaware of, any authority suggesting that borderline intellectual functioning, even at the lowest ten percent of the population, is equivalent or comparable to GLA aptitude scales"); *Camden v. Colvin*, CV No. SKG-13-1553, 2014 WL 2964992, at * 5 (D. Md. June 26, 2014) (concluding that exclusions pertaining to the bottom percentiles of the national population are not valid proxies for determining whether a claimant's limitations preclude claimant from performing DOT representative occupations); *Bowie v. Colvin*, No. 2:12-cv-205-DBH, 2013 WL 1912913, at *10 (D. Me. March 31, 2013) (rejecting claimant's argument that claimant's IQ in the 4.2 percentile precluded her from jobs with a DOT verbal aptitude above the bottom 10%).

Page 24 - FINDINGS AND RECOMMENDATION

Third, Contreras challenges the ALJ's failure to include in the RFC the lay witness testimony that she "has a short fuse." For the reasons stated in **Section III.C.**, above, the ALJ properly considered the lay testimony in formulating Contreras' RFC.

Finally, Contreras argues that the ALJ's hypothetical was "defective" because it "failed to address the ALJ's own finding that [Contreras] has 'moderate' limitations in concentration, persistence, or pace." (Pl.'s Brief 20.) On the contrary, the ALJ appropriately "translated" Contreras' moderate limitations in concentration, persistence, or pace, into the restriction that Contreras be limited to simple tasks. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2012) ("[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony.").

The ALJ asked the VE whether an individual with Contreras' vocational profile could perform a significant number of jobs in the national economy. (Tr. 23-24, 68-71.) The VE testified that an individual with Contreras' RFC and vocational profile could perform a significant number of jobs in the national economy, including cleaner of lab equipment and polisher of optical goods. (Tr. 24, 74-75.) The VE further testified that these representative occupations were unskilled and classified at the light work and sedentary level of physical exertion. (Tr. 22, 74-75.) For all of the reasons discussed above, the Court finds that the Commissioner met her burden at step five.

## IV. CONCLUSION

The Court recommends that the District Judge AFFIRM the Commissioner's decision.

## V. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed,

the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 20th day of October 2015.

STACIE F. BECKERMAN
United States Magistrate Judge